# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF MISSOURI
# WESTERN DIVISION

| | |
|---|---|
| GLADYS M. LEWIS, | ) |
| Plaintiff, | ) ) ) |
| v. | ) Case No. 10-0478-CV-W-NKL ) |
| MICHAEL J. ASTRUE, Commissioner of Social Security, | ) ) ) |
| Defendant. | ) ) ) |

## ORDER

Before the Court is Plaintiff Gladys M. Lewis's Social Security Complaint [Doc. # 1] brought under 42 U.S.C. §§ 405(g) and 1383(c) to review a decision of the Commissioner of Social Security ("Commissioner") denying her applications for disability insurance benefits and supplemental security income. For the following reasons, the Court affirms the Commissioner's decision.

**I.  Background[1]**

In her Social Security application, Plaintiff alleged that she was born in 1957 and became disabled on July 1, 2000, at age 42. She alleged disability due to a heart attack, a stroke, an overactive thyroid, and high blood pressure. After the initial denial of her applications, Plaintiff alleged that she was slower and had more fatigue. Defendant

---

[1] The facts and arguments presented in the parties' briefs are duplicated here only to the extent necessary. Portions of the parties' briefs are adopted without quotation designated.

Commissioner generally adopts the following facts as set out in Plaintiff's Statement of Facts. [Doc. # 10 at 3.]

### A. Medical Evidence

On January 5, 2004, Plaintiff Lewis was admitted to St. Luke's Hospital after developing substernal chest pain. On admission, her labs demonstrated a positive troponin I, which went up as high as 12.6, consistent with non-Q wave myocardial infarction. She underwent left heart catheterization, during which she developed a significant hypertension with a blood pressure of 230/130 and was transferred to intensive care. She also underwent a renal angiography that did not demonstrate significant renal artery stenosis. Lewis was discharged on January 9, 2004, with diagnosis of non-ST segment elevation myocardial infarction. Her medications included Amiodipine, Lipitor, Carvedilol, Lasix, and Cozaar.

By letter dated February 10, 2004, Diane Cunningham, R.N., noted she saw Lewis that day for cardiovascular re-evaluation at Cardiovascular Consultants. Lewis reported she continued to experience shortness of breath with exertion, but it had improved since her hospitalization. She also stated she had a small stroke in 1999 with residual left-sided weakness. A physical exam revealed Lewis had bilateral 1+ peripheral edema. Electrocardiogram results revealed sinus rhythm with occasional PAC, and inverted T waves in V5 and V6. The impression was coronary artery disease with non-Q-wave infarction in January 2004; hypertension, currently well controlled; dyslipidemia treated with Lipitor; tobaccoism; and obesity. Lewis was going to attempt to stop smoking with the help of nicotine gum.

On February 18, 2004, Plaintiff Lewis visited Truman Medical Center for endocrinology follow up. She had thyroid ablation in November 2003. Her doctor noted her recent myocardial infarction. He planned to check her thyroid levels.

By letter dated March 3, 2004, Diane Cunningham, the cardiac nurse at Cardiovascular Consultants, reported she evaluated Plaintiff Lewis that day. Lewis continued to have shortness of breath and also complained of left leg fatigue with some calf discomfort during ambulation. She attended cardiac rehabilitation for four sessions but was unable to return because she was helping to care for her niece's son. Her blood pressure remained moderately elevated and she continued to smoke about a half pack of cigarettes a day.

Lewis weighed 241 pounds. Physical exam revealed normal S1 and S2 with a 1/6 systolic murmur heard at the apex and a 2/6 systolic murmur heard at the right upper sternal border. She had trace edema bilaterally.

An echocardiogram on February 27, 2004, revealed mildly reduced left ventricular systolic function; mild left ventricular dilation with akinesis of the inferior posterior walls and basal lateral segments; and mild to moderate mitral regurgitation. Ms. Cunningham increased the dose of Norvasc, discontinued Lasix, and reinitiated hydrochlorothiazide.

On February 17, 2005, Plaintiff Lewis visited Gazala Parvin, M.D., for follow up of her chronic medical problems. Physical exam revealed she weighed 260 pounds. She had 2+ pitting edema in both ankles and lower leg. Dr. Parvin's assessment was hypertension with mildly elevated blood pressure currently; hypothyroidism; and hypercholesterolemia.

Dr. Parvin advised her to restart hydrochlorothiazide and Lasix and to continue her three other anti-hypertensive medications. Her hypothyroidism was uncontrolled in January 2005 and Dr. Parvin instructed her to continue her higher dose of Levoxyl. He continued the same dose of Lipitor. Dr. Parvin noted Lewis reported she was going without cigarettes for three or four days in a week.

On March 21, 2005, Plaintiff Lewis visited Randall Thompson, M.D., at Cardiovascular Consultants for an annual evaluation. Lewis reported she was feeling fairly well and was walking about a mile a day. She experienced some mild chest tingling, but no other chest discomfort. She reported fatigue, daytime drowsiness, and swelling of ankles and legs. She said she woke up unrefreshed. She also reported numbness and weakness.

On physical exam, Plaintiff Lewis stood five feet six inches tall and weighed 253 pounds with a BMI of 40.80. Dr. Thompson noted Lewis had coronary artery disease based on prior cardiac catheterization; hypertension, currently controlled; dyslipidemia with fair control; obesity; and tobaccoism. Lewis was still smoking a few cigarettes a day. Dr. Thompson increased her dose of Lipitor and suggested she try stopping furosemide or take it only as needed for ankle edema. She was to follow up in one year.

On March 22, 2005, Plaintiff Lewis returned to Dr. Parvin for follow up. He noted a recent exam revealed enlarged uterus and ultrasound revealed the presence of multiple uterine fibroids and a small cyst in the left ovary. He referred her to a gynecologist.

On October 28, 2005, Plaintiff Lewis returned to Dr. Parvin for follow up on hypertension, hypercholesterolemia, and pain in her right knee. Physical exam revealed she

weighed 256 pounds and had 2+ pitting edema bilaterally in the ankles. Right knee joint revealed mild tenderness on palpation of right medial part of the knee around the patella. Dr. Parvin gave her Naprosyn for right knee bursitis. She advised her to continue Coreg, Cozaar, hydrochlorothiazide, Norvasc, aspirin, and furosemide at current doses.

On January 25, 2006, Plaintiff Lewis underwent uterine artery embolization procedure to treat uterine fibroids.

On April 3, 2006, Plaintiff Lewis returned to Dr. Parvin for follow up. She weighed 269 pounds and her blood pressure was 158/88. Lewis reported that she quit cigarettes completely in January 2006. Dr. Parvin noted her hypertension was uncontrolled and said he would add a new medication if it remained so.

On May 2, 2006, Plaintiff Lewis returned to Cardiovascular Consultants for an annual evaluation. Her chief complaint was dizziness. Lewis reported chest discomfort about every other week. She said she tried to exercise by walking two or three times a week, but said she had to walk slowly and had trouble keeping up with a walking companion. She reported fatigue, daytime drowsiness, waking up unrefreshed, shortness of breath, swelling of legs and ankles, lightheadedness, and weakness. A physical exam revealed she weighed 268 pounds with BMI of 43.30. No edema was noted. An EKG revealed normal sinus rhythm, left atrial enlargement, borderline first degree AV block, and borderline low voltage. The impression was coronary artery disease; hypertension, controlled; mild lightheadedness; dyslipidemia, fair control; and obesity. Her dose of Lipitor was doubled and she was instructed to go ahead with nuclear cardiac stress test scheduled that day. During the test, Lewis experienced

symptoms of dizziness, lightheadedness, shortness of breath, leg fatigue, and chest discomfort.

On May 23, 2006, Dr. Thompson of Cardiovascular Consultants wrote a letter to Dr. Parvin in which he reported that Lewis underwent exercise myocardial perfusion imaging which revealed localized areas of ischemia, mixed with nontransmural scar, probably in the distribution of a diagonal vessel; mixture of ischemia, plus nontransmural scar, inferiorly and inferolaterally. He recommended continued medical treatment and PET scan. He added that his nurse noted Lewis was having dyspnea both at rest and with activity.

On May 25, 2006, Plaintiff Lewis visited Norman McCarthy, D.O., for a consultative evaluation at the request of Social Security. Lewis told Dr. McCarthy she was unable to work because she had a stroke, had an myocardial infarction, and her medications make her very sleepy. She stated she quit smoking in January 2006. On physical exam, Lewis weighed 271 pounds. Her blood pressure was 168/96. She had a great deal of dental decay. She exhibited normal range of motion and strength with the exception of hip adduction. Dr. McCarthy believed that this was due to her obesity. He noted hypothyroid, hypertension, shortness of breath, and chronic tobacco abuse. He concluded that he found no evidence of functional restrictions or physical impairments.

On May 31, 2006, Plaintiff Lewis returned to Cardiovascular Consultants and saw Kristina Calkins, a cardiac nurse. She noted that Lewis was unable to undergo PET scan for insurance reasons and because she could not pay out of pocket. Chest x-ray revealed no acute processes, but did reveal mild cardiomegaly. On physical exam, her BMI was 43.90,

her blood pressure was 160/94, and her neck veins were not visible. Impressions were dyspnea; coronary artery disease with recent abnormal myocardial perfusion scan; recent discontinuation of tobacco abuse; hypertension, uncontrolled; dyslipidemia; and valvular heart disease with mild to moderate mitral regurgitation. Her dose of Cozaar was doubled.

On June 23, 2006, echocardiogram results revealed mildly reduced left ventricular systolic function and mildly thickened mitral valve with mitral leaflets with mild to moderate regurgitation.

On June 29, 2006, Plaintiff Lewis returned to Dr. Parvin for follow up of right thumb pain. Lewis reported she continued to have swelling with persistent pain. Lewis also reported increasing pedal edema and shortness of breath. Physical exam revealed she weighed 269 pounds and had 2+ pitting edema in her feet and lower legs. Her right thumb showed mild swelling with edema of the whole thumb. Dr. Parvin requested rheumatoid factor and ANA level to evaluate right thumb arthritis. He instructed Lewis to restart Lasix for pedal edema.

On August 24, 2006, Dr. Parvin noted Plaintiff Lewis had 2+ pitting edema in her ankles and lower legs. She weighed 275 pounds. He assessed hypertension, peripheral edema, dyslipidemia, hypothyroidism, and GERD. Dr. Parvin instructed her to continue all her medications and increase Lasix to reduce her fluid overload.

In a letter dated August 31, 2006, Dr. Thompson of Cardiovascular Consultants reported he examined Plaintiff Lewis that day for cardiovascular follow up. Lewis reported symptoms of edema and leg pain in her left ankle. On physical exam, Lewis weighed 274

7

pounds with BMI of 44.20. She had 1+ pitting edema in her extremities. An EKG revealed normal sinus rhythm, possible left atrial enlargement, and minor ST changes. Dr. Thompson's impressions were coronary artery disease; hypertension, treated; symptoms of dyspnea, probably multi-factorial and caused by prior smoking, deconditioning, obesity, mitral regurgitation, and mild LV dysfunction; mild anemia; and complaints of fatigue. He recommended she continue her current medications and start taking Zetia.

On October 24, 2006, Dr. Parvin examined Plaintiff Lewis and noted mild bilateral ankle edema with pitting. He continued her current medications.

On November 7, 2006, x-ray of Plaintiff Lewis's knees revealed osteoarthritic changes of the bilateral knees, worse on the right than the left.

In a letter dated March 2, 2007, Dr. Thompson of Cardiovascular Consultants reported he examined Plaintiff Lewis that day. Lewis reported that she had been off her medications since December 2006 because there was a gap in her Medicaid coverage. She reported symptoms of fatigue, daytime drowsiness, swelling of ankles and legs, numbness and weakness, and arthralgias. On physical exam she weighed 282 pounds with BMI of 45.50. Her neck veins were not visible and her teeth were in poor repair. She had 1+ pitting edema. Dr. Thompson put her back on her medications and ordered myocardial perfusion imaging ("MPI") study. Results of the MPI revealed mild ischemia laterally near the apex and localized, non-transmural injury and peri-infarctional ischemia inferolaterally. The results were similar to her prior study.

On April 10, 2007, Plaintiff Lewis visited Dr. Parvin. She weighed 274 pounds and her blood pressure was 150/78. She had 1+ ankle edema bilaterally. Dr. Parvin noted her hypertension was uncontrolled and restarted Norvasc. On June 14, 2007, Lewis weighed 271 pounds and her blood pressure was 120/80. She had mild 1+ pitting ankle edema.

By letter dated August 20, 2007, Dr. Thompson of Cardiovascular Consultants reported examining Lewis that day. Lewis reported symptoms of fatigue, daytime drowsiness, snoring, waking up unrefreshed, shortness of breath, lightheadedness, numbness and weakness. On physical exam she weighed 280 pounds and had 1+ pitting edema. Dr. Thompson's impressions were coronary artery disease; hypertension, treated; multifactorial dyspnea; obesity; prior smoking; some valvular regurgitations; cardiac echo showing mild to moderate mitralregurgitation; and treated dyslipidemia.

On November 15, 2007, Plaintiff Lewis returned to Dr. Parvin and reported increased swelling of her legs. She also wanted follow up for potential hypothyroidism because she was feeling tiredand did not feel like doing any exercise. She weighed 281 pounds. She had bilateral 1+ pitting ankle edema. Dr. Parvin advised Lewis to elevate her feet whenever she was sitting and to avoid prolonged standing. Blood work revealed Lewis's TSH was high and she needed to increase her Levoxyl dose.

On January 15, 2008, Lewis weighed 284 pounds and had 2+ ankle and leg pitting edema. Dr. Parvin again advised Lewis to keep her legs elevated. She noted Lewis had impaired fasting glucose and appeared to have all the symptoms and signs consistent with metabolic syndrome.

On January 22, 2008, Lewis returned to Dr. Parvin. She reported her leg swelling was improved early in the morning and worsened as the day went by. She said she had dryness and itching sensation in both legs. She reported feeling tired lately and felt short of breath when walking a short distance. She weighed 286 pounds and had 1+ feet, ankle, and lower leg edema. She also had some stasis dermatitis with slight irritation. Dr. Parvin assessed increased edema with stasis dermatitis. She instructed Lewis to buy ACE wrap and apply compression bandage to both legs early in the morning and remove it at nighttime. Dr. Parvin stated that Lewis appeared to have some venous insufficiency along with lymphatic insufficiency.

On January 22, 2008, Dr. Parvin also completed a Medical Source Statement ("MSS") regarding Plaintiff Lewis's work-related impairments. The MSS noted that Lewis weighed 286 pounds. She was receiving treatment for hypertension, dyslipidemia, bilateral leg edema, hypothyroidism, impaired fasting glucose, myocardial infarction in 2003, transient ischemic attack in 1999, obesity, and GERD. Her medications included Coreg, Cozaar, HCTZ, Norvasc, Lasix, Levox, and Vytorin. Her prognosis was guarded.

Dr. Parvin indicated that Plaintiff Lewis could lift 10 pounds frequently and 20 pounds occasionally; carry 10 pounds continuously and 20 pounds occasionally; sit 8 hours of an 8 hour workday, stand 4 hours and walk a total of 1 hour. She could occasionally push and pull, and balance; and should never climb, stoop, crouch, kneel, or crawl. She should avoid all exposure to heights, moving machinery, vibrations, noise, dust, fumes, odors, smoke, chemicals, wetness, dryness, and temperature extremes. The MSS noted that Lewis

becomes short of breath with any physical activity.  Dr. Parvin also opined that Lewis was not able to perform the above physical activities 8 hours per day in a competitive work setting with no more than 1 day's absence per month due to illness.

On January 29, 2008, Plaintiff Lewis underwent an echocardiogram that revealed low-normal left ventricular systolic function and normal cardiac chamber dimensions except for mild left atrial dilatation.  Left ventricular function had improved compared to the study in June 2006.

On February 11, 2008, Plaintiff Lewis underwent pulmonary function testing.  The diagnoses were mild obstructive airways disease and increased diffusion.

On February 27, 2008, Plaintiff Lewis returned to Dr. Parvin.  On physical exam, Lewis weighed 289 pounds and had 2+ pitting ankle edema.  Dr. Parvin noted she had been started on Flovent and albuterol for airway obstruction disease.  He also started her on Metformin for impaired fasting glucose.  Her other medications included Coreg, Cozaar, HCTZ, Norvasc, furosemide, and Levoxyl.

On April 1, 2008, Lewis visited Cardiovascular Consultants for cardiac testing.  She underwent exercise stress test that revealed an area of injury with mild associated ischemia inferiorly and inferolaterally, in the distribution of an obtuse marginal branch vessel territory; mild ischemia anteriorly, probably in a diagonal branch distribution; and similar perfusion pattern to prior study with left ventricular systolic function measuring slightly higher than previously.

**B.**	**Hearing before the ALJ**

At a hearing on May 5, 2008, Plaintiff Lewis testified she worked in the past as a hotel housekeeper and maintenance worker. She stated that she could no longer do this work because of her health. She said she could not walk far or lift enough to do this work. She said she could walk 25 feet, then would have to stop and use her inhaler. She alleged that she suffered a heart attack four years ago and still felt fatigue. She stated that she rests a lot and has to put her feet up because of swelling. Her feet swell every day and she stated she would prop her feet for 30 to 45 minutes at a time, several times a day. She said that she lives alone and was unable to babysit her grandkids like she used to. She thought she was on her feet about two hours out of the day. Lewis stated that she had her GED.

Jeanine Metildi, a vocational expert ("VE"), also testified at the hearing. The Administrative Law Judge ("ALJ") posed a hypothetical question in which he assumed Lewis's past work and education. In addition, he assumed an individual who could perform light work except that she could stand for four hours of an eight hour day; walk one hour out of eight; could never stoop, climb, kneel, crouch, or crawl; could occasionally use her upper extremities for pushing and pulling; could work at heights or around machinery; and should avoid concentrations of dangerous machinery, noise, dust, fumes, wetness, chemicals, dryness, and temperature extremes.

The VE replied that these limitations would eliminate Lewis's past work. She stated that there would be other light jobs, but the numbers would be reduced because of the limitations of standing only four hours and walking only one hour. Examples of such work were assembler, with 86,000 jobs nationally and 9,000 in Missouri; and electronics worker,

with 87,000 jobs nationally and 6,000 in Missouri. The assembler job numbers would be reduced by 3/4 and the electronics worker job numbers would be reduced by 1/2. The VE then opined that "many of the electronic worker jobs are done sedentary," and that "I still believe they could perform those jobs at the reduced numbers." [Tr. at 31.] Although Plaintiff's attorney posed a hypothetical in which the individual "had to sit with their feet elevated to waist level or higher," the attorney then stated, "I didn't see any doctor who actually said sit with your feet up." *Id.* at 32.

### C. The ALJ's Decision

The ALJ found that Plaintiff Lewis had severe impairments of cardiopulmonary insufficiency with edema of bilateral lower extremities, and obesity. He determined that she retained the residual functional capacity ("RFC") to perform light work, except that she can stand for no more than four of eight hours; can walk for no longer than one of eight hours; can only occasionally balance, push, or pull; must avoid all exposure to heights, moving machinery, loud noise, and respiratory irritants; and is limited to the performance of simple tasks.

The ALJ noted that his RFC was consistent with Lewis's treating physician's opinion. In the MSS dated January 22, 2008, Dr. Parvin indicated that Plaintiff Lewis could lift 10 pounds frequently and 20 pounds occasionally; carry 10 pounds continuously and 20 pounds occasionally; sit 8 hours of an 8 hour workday, stand 4 hours and walk a total of 1 hour. She could occasionally push and pull, and balance; and should never climb, stoop, crouch, kneel, or crawl. She should avoid all exposure to heights, moving machinery, vibrations, noise,

13

dust, fumes, odors, smoke, chemicals, wetness, dryness, and temperature extremes. Dr. Parvin also opined that Lewis was not able to perform the above physical activities 8 hours per day in a competitive work setting with no more than 1 day's absence per month due to illness.

While giving weight to Plaintiff's treating physician, the ALJ did not accept the assessment of the consultative examiner, who concluded that Plaintiff had no loss of work-related function, except zero degrees of adduction of both legs. The ALJ found that the consultative examiner's assessment was contradicted by the record.

The ALJ also found that Lewis's subjective complaints were not credible to the extent they were inconsistent with his RFC assessment:

> I find that the claimant's allegations of total disability are inconsistent with her activities. . . . Lorse Morton, the claimant's friend, states that the claimant has no problems caring for her grooming or bathing needs, prepares simple foods, cleans her home, shops, and irons and does laundry. She goes outside every day unassisted. . . . . Additionally, on September 14, 2005, some two years after she states she became completely disabled, the claimant told her doctor that she worked full-time as a babysitter. However, she denied all work activities on her disability application materials.

[Tr. at 16 (citations omitted).] As an additional factor in her overall credibility, the ALJ also noted that the claimant was still smoking cigarettes as of May 25, 2006, despite her physician's advice to stop.

## II. Discussion

### A. Standard of Review

In reviewing the Commissioner's denial of benefits, the Court considers whether the ALJ's decision is supported by substantial evidence on the record as a whole. *See Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008). "Substantial evidence is evidence that a reasonable mind would find adequate to support the ALJ's conclusion." *Nicola v. Astrue*, 480 F.3d 885, 886 (8th Cir. 2007) (citation omitted). The Court will uphold the denial of benefits so long as the ALJ's decision falls within the available "zone of choice." *See Casey v. Astrue*, 503 F.3d 687, 691 (8th Cir. 2007). "An ALJ's decision is not outside the 'zone of choice' simply because [the Court] might have reached a different conclusion had [it] been the initial finder of fact." *Id.* (quoting *Nicola*, 480 F.3d at 886).

### B.   Plaintiff's Arguments

On this appeal from the ALJ's decision, Plaintiff Lewis argues that the ALJ (1) accorded inadequate weight to the opinion of the treating physician; (2) failed to make proper credibility and RFC findings; and (3) relied on the flawed testimony of the VE. These arguments are addressed in turn below.

#### 1.   The ALJ Properly Considered Dr. Parvin's Opinion

Plaintiff Lewis argues that the ALJ did not properly consider the opinion of her treating physician, Dr. Parvin. However, the ALJ noted that Dr. Parvin's opinion about Plaintiff's RFC was "well-reasoned" and entitled to more weight than the opinion of the consulting examiner. [Tr. at 15-16.] The ALJ found that his own RFC was consistent with Dr. Parvin's assessment. The ALJ agreed that Lewis had the RFC to stand for no more than four of eight hours; walk no longer than one of eight hours; can occasionally balance, push,

15

or pull; must avoid all exposure to heights, moving machinery, loud noise, and respiratory irritants; and was limited to the performance of simple tasks. The ALJ's RFC tracks Dr. Parvin's assessment of Plaintiff's physical impairments dated January 22, 2008. Even though Dr. Parvin provided no medical or clinical findings supporting her mental assessment, the ALJ nonetheless restricted Lewis to simple tasks.

Although Plaintiff Lewis alleges disability since July 1, 2000, Dr. Parvin limits her physical and mental assessments to the period beginning January 22, 2008. Further, as Lewis notes, the ALJ did not address Dr. Parvin's check on the assessment form reflecting her opinion that Lewis could not perform the RFC shown for eight hours a day in competitive employment with no more than one day's absence per month. Nevertheless, where the assessment form asked for medical findings supporting her assessments, Dr. Parvin left the spaces blank.

In her MSS, Dr. Parvin also opined that Plaintiff Lewis could sit for eight hours in an eight-hour workday. Although Dr. Parvin's notes from November 23, 2007 – more than 18 months after the relevant period began – reflect her suggestion that Lewis elevate her legs while sitting, Dr. Parvin's subsequent MSS did not include a restriction that Plaintiff must elevate her legs when sitting.

It is clear that the ALJ considered Dr. Parvin's opinion and gave it substantial weight. Dr. Parvin's opinion that Plaintiff Lewis could not perform in competitive employment was an opinion taking into account vocational factors. *See Turley v. Sullivan*, 939 F.2d 524, 527 (8th Cir. 1991) (ALJ properly "accepted the medical opinions of the treating physicians, but

simply refused to accept their other conclusions which were based, in part, on vocational factors").

For the reasons stated above, the ALJ properly considered Dr. Parvin's medical opinion and gave it substantial weight. Indeed, the ALJ's RFC was primarily based on Dr. Parvin's MSS.

### 2.   The ALJ Made Proper Credibility and RFC Findings

Plaintiff Lewis argues that the ALJ ignored evidence when he made his credibility and RFC findings. Under *Polaski v. Heckler*, in evaluating a claimant's subjective complaints, the ALJ must give consideration to a claimant's prior work record, as well as to observations by third parties and treating and examining physicians relating to such matters as: (1) the claimant's daily activities; (2) the duration, frequency and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, and side-effects of medication; and (5) functional restrictions. 739 F.2d 1320, 1322 (8th Cir. 1984). "An ALJ may discount a claimant's subjective complaints of pain only if there are inconsistencies in the record as a whole." *Johnson v. Chater*, 108 F.3d 942, 947 (8th Cir. 1997) (citation omitted). "While pain may be disabling if it precludes a claimant from engaging in any form of substantial gainful activity, the mere fact that working may cause pain or discomfort does not mandate a finding of disability." *Id.* (quoting *Jones v. Chater*, 86 F.3d 823, 826 (8th Cir. 1996)).

Here, the ALJ stated that he considered such evidence in accordance with the relevant Social Security regulations and rulings. *See Tucker v. Barnhart*, 363 F.3d 781, 783 (8th Cir. 2004) ("The ALJ is not required to discuss each *Polaski* factor as long as the analytical

framework is recognized and considered.") (citation omitted). "If the ALJ discredits a claimant's credibility and gives a good reason for doing so, we will defer to its judgment even if every factor is not discussed in depth." *Dunahoo v. Apfel*, 241 F.3d 1033, 1038 (8th Cir. 2001) (citing *Brown v. Chater*, 87 F.3d 963, 966 (8th Cir. 1996)).

The ALJ noted that on September 14, 2005, more than five years after she alleged total disability, Plaintiff Lewis told her doctor that she worked full-time as a babysitter. Lewis denied all work activities in her disability application materials. The ALJ found this inconsistency to seriously impair Lewis's credibility.

Furthermore, Plaintiff Lewis and her friend both reported that Lewis made her bed, performed self care, did laundry, washed dishes, vacuumed, cooked, watched television, read, visited with friends, did puzzles, and walked daily. The ALJ noted that Lewis goes outside every day unassisted. "[A]cts such as cooking, vacuuming, washing dishes, doing laundry, shopping, driving, and walking, are inconsistent with subjective complaints of disabling pain." *Medhaug v. Astrue*, 578 F.3d 805, 817 (8th Cir. 2009) (citation omitted).

Plaintiff Lewis also argues that the ALJ failed to discuss the combined effect and interaction of her obesity with her other impairments. Lewis discusses multiple possible results of her obesity in combination with other impairments. The ALJ properly considered her obesity. Moreover, the Social Security policy interpretation ruling titled "Titles II and XVI: Evaluation of Obesity" specifically directs that the ALJ may

> not make assumptions about the severity or functional effects of obesity combined with other impairments. Obesity in combination with another impairment may or may not increase the severity or functional limitations of

> the other impairment. We will evaluate each case based on the information in
> the case record.

SSR 02-1p, 2000 WL 628049 at *6 (Sept. 12, 2002). Defendant Commissioner notes that Plaintiff Lewis apparently did not consider her obesity to be an impairment at the time she filed her application. When Dr. Thompson wrote to Dr. Parvin on August 31, 2006, he included dyspnea in his impressions, which he opined was "probably" caused by several factors, including obesity. [Tr. 255.] On January 22, 2008, Dr. Parvin did not include obesity in her list of Plaintiff's impairments.

Based upon the information in the record, the ALJ properly considered Plaintiff's obesity along with her other impairments, while avoiding assumptions about the functional effects of obesity combined with other impairments. Ultimately, the ALJ's RFC finding is supported by substantial evidence, including Dr. Parvin's own assessment.

### 3. The ALJ Properly Considered the Vocational Expert's Testimony

Plaintiff Lewis argues that the ALJ should not have relied upon the VE's testimony because not all of her limitations were included in the hypothetical question posed. Lewis argues that the ALJ indicated that she must avoid all exposure to heights and moving machinery, but the hypothetical at the hearing stated that she could work at heights or around machinery.

Plaintiff Lewis fails to demonstrate how such a de minimus error prejudiced her Social Security claim. The VE identified the jobs of assembler and electronics worker, neither of which involve heights or dangerous machinery. *See Hepp v. Astrue*, 511 F.3d 798, 806 (8th

Cir. 2008) ("Consequently, the deficiency does not require reversal since it had no bearing on the outcome."). In fact, the VE opined that "many of the electronic worker jobs are done sedentary." [Tr. at 31.] The ALJ properly relied upon the VE's testimony.

For the reasons stated above, substantial evidence supports the ALJ's decision.

## III. Conclusion

Accordingly, it is hereby ORDERED that Plaintiff Gladys Lewis's Social Security Complaint [Doc. # 1] is DENIED.

    s/ Nanette K. Laughrey
NANETTE K. LAUGHREY
United States District Judge

Dated: April 15, 2011
Jefferson City, Missouri